# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

PRESTON SIMPSON,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )          No.  1:13-CV-168 NAB
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
                Defendant.          )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 1383(c)(3) for judicial review of the

Commissioner's final decision denying Preston Simpson's application for

supplemental security income (SSI) under Title XVI of the Social Security Act, 42

U.S.C. §§ 1381, *et seq.*  All matters are pending before the undersigned United

States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. §

636(c).  For the reasons set forth below, the Commissioner's decision is affirmed.

## I.  Procedural History

Plaintiff Preston Simpson applied for SSI on April 23, 2010, claiming that

he became disabled on January 1, 1993, because of depression, chemical

imbalance, anxiety, and other mental conditions.  (Tr. 221-27, 268.)  On July 19,

2010, the Social Security Administration denied plaintiff's claim for benefits.  (Tr.

123, 125-28.)  At plaintiff's request, a hearing was held before an administrative

law judge (ALJ) on April 12, 2012, at which plaintiff and a vocational expert

testified.  (Tr. 73-122.)  A supplemental hearing was held on August 27, 2012, at

which plaintiff and a medical expert testified.  (Tr. 44-72.)  On September 7, 2012,

the ALJ issued a decision denying plaintiff's claim for benefits, finding plaintiff

able to perform work as it exists in significant numbers in the national economy.

(Tr. 25-38.)  After the receipt of additional evidence, the ALJ reopened the

decision and issued a supplemental decision on September 27, 2012, again finding

plaintiff able to perform other work as it exists in significant numbers in the

national economy.  (Tr. 9-19.)  On September 18, 2013, the Appeals Council

denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-3.)[1]  The ALJ's

determination of September 27, 2012, thus stands as the final decision of the

Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff raises numerous claims that

the final decision is not supported by substantial evidence on the record as a whole.

Specifically, plaintiff claims that with his multiple diagnosed mental impairments

---

[1] The Appeals Council stated in its Notice of Action that it was addressing plaintiff's request for review "of the Administrative Law Judge's decision dated September 14, 2012."  (Tr. 1.) Because the decisions issued by the ALJ in this cause were dated September 7 and September 27, 2012, it is unclear which decision was considered by the Appeals Council.  In his brief, plaintiff avers that the Appeals Council declined to review the ALJ's September 27, 2012, decision.  The undersigned therefore considers the Appeals Council's reference to a "September 14, 2012," decision to be a scrivener's error and not to affect the outcome of this case.

and the effects thereof, he meets a listing for a disabling mental disorder under §

12.00 of the Listings of Impairments and that the ALJ erred in finding otherwise.

Plaintiff also claims that the ALJ failed to consider his learning disorder and low

Global Assessment of Functioning (GAF) scores and, further, that the ALJ erred

by relying on inaccurate evidence of drug use in determining his subjective

complaints not to be credible.  Plaintiff also contends that the ALJ erred by failing

to consider a closed period of disability.  Plaintiff further argues that the ALJ failed

to account for his limited ability to work with others when determining his mental

residual functional capacity (RFC).  Finally, plaintiff contends that the ALJ erred

when he failed to pose a hypothetical question to a vocational expert at the

supplemental hearing.  Plaintiff requests that the matter be reversed and remanded

to the Commissioner for an award of benefits.

## II.  Testimonial Evidence Before the ALJ

A.    <u>Hearing Held on April 12, 2012</u>

1.    *Plaintiff's Testimony*

At the hearing on April 12, 2012, plaintiff testified in response to questions

posed by the ALJ.  Plaintiff was unrepresented at the hearing.

At the time of the hearing, plaintiff was thirty-one years of age.  (Tr. 88.)

Plaintiff has an eighth grade education and never received his GED.  (Tr. 90.)

Plaintiff is married and has three children, ages nine years, seven years, and five

months.  (Tr. 88-89.)  Plaintiff lives alone in a trailer.  Plaintiff receives food stamps and Medicaid assistance.  (Tr. 89-90.)

In April 2010, plaintiff was released from prison after having served twelve years for the offenses of Statutory Rape, Stealing, and Child Molestation.  (Tr. 91-92, 94.)  Plaintiff occasionally works odd jobs, such as mowing lawns or discarding appliances, but he has had no steady employment since his release.  Plaintiff testified that he worked in 2010 for Rose Concrete forming concrete molds but was fired from this job because his mood was unstable.  (Tr. 91-92.)  Plaintiff testified that he has applied for other jobs but has not been hired because of his status as a convicted sex offender.  (Tr. 92-93.)

Plaintiff testified that he began having emotional disturbances in January 1993 when he was twelve years of age that led to criminal activity.  Plaintiff testified that his emotional problems consisted of moods, depression, and anxiety and that such problems stemmed from physical, sexual, and emotional abuse he experienced as a child.  (Tr. 95-96.)

Plaintiff testified that he has suffered from depression since childhood and currently experiences crying spells on occasion.  Plaintiff testified that he also has anxiety but controls it by trying to keep it to himself.  (Tr. 108.)  Plaintiff testified to five suicide attempts and to previously being assigned to a hospital mental unit because of an attempt.  (Tr. 109.)  Plaintiff testified that he took medication and

was counseled regularly while in prison and was referred to outside counseling upon his release. (Tr. 113.) Plaintiff testified that he has been prescribed Citalopram as an anti-depressant but has been out of this medication since January. (Tr. 103.) Plaintiff also testified that he has been prescribed Busiprone, Doxepin, Ativan, and Klonopin. (Tr. 104-05.) Plaintiff testified that taking medication "definitely" helped with his anxiety. (Tr. 109.)

Plaintiff testified that he rarely drinks and has never had a drinking problem. Plaintiff testified that he smoked marijuana and used drugs before he went to prison but currently does not use any illicit substances. (Tr. 102.)

As to his current daily activities, plaintiff testified that he has no routine regarding what time he gets up any given day. (Tr. 96.) Plaintiff testified that he generally sits around during the day, talks on the telephone with his wife or mother, and may go out looking for work if he has access to a vehicle. (Tr. 97.) Plaintiff cooks his own meals, washes his own dishes, and generally performs his own household chores. Plaintiff's mother does his laundry because he does not have a washer or dryer. Plaintiff goes to the grocery store with his mother. (Tr. 99-100.) Plaintiff testified that he may take a walk with his dog during the evening. He tries to see his son on the weekends. Plaintiff testified that he has no friends and does not like to be around people other than his family or people he has grown up with. (Tr. 98, 114-15.) Plaintiff attends church when he can but is

limited because he does not have a vehicle. (Tr. 98-99.) Plaintiff testified that he no longer volunteers at an animal shelter because of transportation difficulties. (Tr. 114.) Plaintiff reads his mail and sometimes reads magazines and the Bible. (Tr. 99.) Plaintiff testified that his hobbies include fishing and building jewelry boxes and other things out of playing cards. (Tr. 101.)

2. *Testimony of Vocational Expert*

Susan Shea, a vocational expert, testified at the hearing in response to questions posed by the ALJ and plaintiff.

Ms. Shea testified that plaintiff had no past relevant work. (Tr. 117.)

The ALJ asked Ms. Shea to assume an individual thirty-one years of age with a limited education, no past work experience, and no exertional limitations. The ALJ asked Ms. Shea to further assume the person to be limited to simple, repetitive tasks and instructions and to be further limited to only occasional interaction with supervisors, co-workers, and the public. Ms. Shea testified that such a person could perform medium, unskilled work as a manufacturing helper, of which 11,000 such jobs exist in the State of Missouri; laundry worker, of which 5,300 such jobs exist in the State of Missouri; and machine feeder, of which 11,000 such jobs exist in the State of Missouri. (Tr. 117-18.)

In response to Ms. Shea's testimony, plaintiff engaged in a colloquy whereby he averred that these jobs are not available to him as demonstrated by his

failed attempts to secure employment in these or similar jobs. Plaintiff further averred that his psychological state, as well as having to report his status as a registered sex offender, prevent him from securing employment. (Tr. 120-21.)

B.   Hearing Held August 27, 2012

1.   *Plaintiff's Testimony*

Plaintiff was represented by counsel at the hearing on August 27, 2012, and testified in response to questions posed by the ALJ and counsel.

Plaintiff currently lives in a small house next door to his mother. Plaintiff receives food stamps. (Tr. 51.)

Plaintiff testified that he was fired from Rose Concrete after working only three days. Plaintiff testified that his anxiety and post-traumatic stress disorder caused him to be unable to concentrate on the job. Plaintiff testified that he could not function at the time because he had no medication or insurance when he was released from prison. (Tr. 49.)

Plaintiff testified that he has periods whereby he feels confident and feels he can accomplish anything. During such periods, plaintiff cannot sleep, has racing thoughts, and abundant energy. Plaintiff testified that he starts many projects but never finishes them because he has difficulty completing tasks. Plaintiff testified that he also experiences periods of depression whereby he does not have the energy to get out of bed and he loses interest in everything in life. Plaintiff testified that

such periods have lasted up to four or five days and that his mother cares for him during these times.  (Tr. 54-55.)

Plaintiff testified that he went to the hospital a few months prior because of suicidal thoughts and was given medication.  (Tr. 55.)  Plaintiff testified that he continues to have suicidal thoughts because he feels he is a lost cause and is misunderstood by the world.  (Tr. 62, 64.)  Plaintiff testified that he currently undergoes counseling and takes Celexa, Doxepin, Ativan, and Buspar, which help his condition.  (Tr. 56-57, 66.)  Plaintiff testified that he experiences side effects from Doxepin in that it "put[s him] out" for about fourteen hours, as though he is in a drug-induced coma, and he remains groggy when he awakens.  (Tr. 64.)

Plaintiff testified that he is anxious and experiences racing thoughts in public because he feels as though everyone is watching him and he feels the need to escape the environment.  Plaintiff testified that he also experiences flashbacks of traumatic events in his life.  (Tr. 65-66.)

Plaintiff testified that he experienced chest pain while in prison, which his doctor attributed to anxiety.  Plaintiff testified that he continues to experience such symptoms and that they could occur at any given time.  (Tr. 57-58.)  Plaintiff testified that the prison environment exacerbated his anxiety and depression, and he was placed in protective custody because he could not function.  Plaintiff also testified to being raped in prison.  (Tr. 58-59.)

Plaintiff testified that he has not smoked marijuana in months. (Tr. 61.)

As to his daily activities, plaintiff testified that he gets up, lets his dog out, prepares a cup of coffee, sweeps if necessary, and then just sits in the house. Plaintiff testified that he calls and speaks to his nine-month-old son on the telephone. (Tr. 51-52.) Plaintiff testified that he goes to the grocery store once a month but goes at night. Plaintiff testified that he drives and currently has access to a vehicle. (Tr. 53.) Plaintiff testified that he has no friends and does not trust most people. (Tr. 60-61.)

2.    *Testimony of Medical Expert*

Dr. Kathleeen O'Brien, a licensed clinical psychologist, testified as a medical expert at the hearing in response to questions posed by the ALJ.

Dr. O'Brien testified that the medical record showed that plaintiff had a mood disorder, which is associated with Listing 12.04, and that this disorder had been referred to throughout the record as an adjustment disorder, depressant disorder, or bipolar disorder. Dr. O'Brien testified that a diagnosis of bipolar disorder was not substantiated on recent psychological testing, and that plaintiff's medications were consistent with treatment for depressive disorder or adjustment disorder. (Tr. 68-69.)

Dr. O'Brien testified that the record showed plaintiff to also have an anxiety disorder, which is associated with Listing 12.06, and that this disorder had been

referred to in the record as a generalized anxiety disorder or post-traumatic stress disorder (PTSD). (Tr. 69.)

Dr. O'Brien testified that the most recent psychological evaluation assigned a diagnosis of anti-social personality disorder. Dr. O'Brien noted that this diagnosis had not been rendered previously and was most likely related to plaintiff's incarceration and childhood history of oppositional defiant disorder. Dr. O'Brien testified that such a childhood diagnosis is not applicable to the present circumstances. (Tr. 69.)

Dr. O'Brien also testified that there was evidence in the record of a learning disorder with special education, as well as a non-medical report of attention deficit hyperactivity disorder (ADHD). (Tr. 69.)

Dr. O'Brien testified that the relevant listings associated with plaintiff's mental impairments were Listings 12.04, 12.06, and 12.08. (Tr. 69.)

Dr. O'Brien testified to her opinion that plaintiff's activities of daily living were mildly impaired; that his social functioning was moderately impaired; and that his concentration, persistence, and/or pace were mildly impaired. Dr. O'Brien testified that there was no evidence of true episodes of decompensation in the record. Dr. O'Brien testified to her opinion that plaintiff's mental impairments would cause some restrictions, but none at listing level severity. To support this opinion, Dr. O'Brien testified that the record showed that plaintiff's impairments

were fairly managed on an outpatient basis and that, to the extent he required emergency room treatment in July and August 2011, his condition was not considered to be severe enough to require admittance for a long stay. Dr. O'Brien also cited to evidence of plaintiff's refusal to take medication and attend counseling sessions while incarcerated. (Tr. 70-71.)

3. *Vocational Expert*

Margaret H. Ford, a vocational expert, was also present at the hearing on August 27, 2012. The ALJ determined not to elicit testimony from Ms. Ford, indicating that the vocational expert's testimony from the previous hearing continued to be applicable. (Tr. 71.)

When the ALJ asked counsel if there was anything further, counsel responded, "No, sir. I don't think so." The hearing then concluded. (Tr. 71-72.)

### III. Documentary Evidence / September 7, 2012

When the ALJ rendered his first decision in this cause on September 7, 2012, he had before him the following documentary evidence:

A. Education Records

In a Diagnostic Summary Report dated November 4, 1993, it was noted that plaintiff was enrolled in learning disabled, self-contained classes and regular elective classes. Plaintiff was thirteen years of age and in the seventh grade. It was noted that plaintiff qualified for learning disabled services at the beginning of

second grade.  Current testing showed plaintiff to experience weaknesses in spelling skills, basic computational skills, range of general factual information, visual performance, ability to benefit from sensory-motor feedback, speed of mental operation, vocabulary and verbal paraphrasing, and social/emotional development with the following observed to be significant to very significant: poor ego strength, poor intellectuality, poor academics, poor attention, poor impulse control, poor sense of identity, excessive suffering, poor anger control, excessive sense of persecution, excessive aggressiveness, excessive resistance, and poor social conformity.  Plaintiff was noted to have relatively stronger written language skills.  It was determined that plaintiff met the eligibility criteria to be classified as behaviorally disordered.  (Tr. 386-92.)

In February 1994, plaintiff's teacher reported that plaintiff was performing far below grade level in world geography, language arts, and math – all of which were taught in a self-contained classroom modified for plaintiff's level.  Plaintiff performed at grade level in science.  Plaintiff's IQ scores were noted to be verbal 86, performance 80, and full scale 81.  (Tr. 407-08.)

An Individual Education Plan (IEP) was completed by the Division of Youth Services and Department of Social Services while plaintiff was in the seventh grade.  In the IEP, it was reported that plaintiff interacted appropriately with his peer group and appeared to be making good progress in appropriately handling

situations involving authority figures.  It was noted that plaintiff appeared to be easily frustrated and impatient with himself and tended to give up on his learning ability.  Plaintiff was placed in a regular classroom with modification in an alternative school.  (Tr. 378-83.)  In his final report card for seventh grade, plaintiff earned an F in physical education/health; D's in language arts and contemporary issues; C's in general science, reading, and life skills; and a B in mathematics.  (Tr. 384.)

During the first semester of ninth grade, plaintiff earned F's in math, physical science, and American history; a D in art; and C's in language arts and physical education.  Plaintiff withdrew from school during the second semester. (Tr. 427.)

B.    Medical Records

On March 2, 1994, plaintiff visited the Community Counseling Center (CCC) with complaints of feeling overwhelmed.  Plaintiff was thirteen years of age.  Plaintiff's father reported concern regarding plaintiff's choices, noting plaintiff to currently be on probation for breaking into a home with a group of peers.  Plaintiff's father reported that plaintiff had been diagnosed with attention deficit disorder in the past and was currently enrolled in classes for behavioral disorder.  Mental status examination showed plaintiff to be tearful with a depressed affect and some agitation.  No impairment in thought process was noted.  Plaintiff

was noted to be focused and responsive. Licensed social worker Barbara Morgan noted plaintiff to be pleasant and to probably have average intellectual functioning. Diagnostically, Ms. Morgan noted that adjustment disorder with mixed emotional features was to be ruled out. Parent-child problems and other interpersonal problems were noted. Ms. Morgan assigned a current GAF score of 70 and opined that plaintiff's highest score within the past year was 68.[2] It was determined that plaintiff would undergo individual sessions and joint sessions with his father to understand and cope with his feelings of depression. (Tr. 443-44.)

Plaintiff failed to appear for a scheduled appointment with Ms. Morgan on March 21, 1994. On March 30, plaintiff's father reported to Ms. Morgan that plaintiff's school had recommended that he apply for Medicaid and disability on plaintiff's behalf. An appointment was scheduled with a psychiatrist for assessment. (Tr. 445.) On April 28, plaintiff failed to appear for a scheduled appointment with Ms. Morgan. (Tr. 446.)

On May 13, 1994, plaintiff visited Dr. Reeta Rohatgi at CCC for a psychiatric evaluation upon referral from Ms. Morgan. Plaintiff's chief complaint was that he had decreased energy and was not doing well in school academically.

---

[2] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." *Diagnostic and Statistical Manual of Mental Disorders*, *Text Revision* 34 (4th ed. 2000). A GAF score of 61 to 70 indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

Plaintiff reported feeling depressed, having crying spells and decreased energy, and having no friends.  Plaintiff denied any symptoms of anxiety, psychosis, or mood swings.  Mental status examination showed plaintiff to have a depressed mood and to be despondent and dysphoric.  Plaintiff cried during most of the interview.  Plaintiff reported having feelings of loneliness and that he felt he was picked on by the kids and rejected by his family.  Dr. Rohatgi noted plaintiff to have very low self- esteem.  Dr. Rohatgi diagnosed plaintiff with depressive disorder, not otherwise specified and "other interpersonal problem."  ADHD was to be ruled out.  Dr. Rohatgi also diagnosed plaintiff with mixed developmental disorder in arithmetic, reading, and language.  Plaintiff was assigned a GAF score of 65.  Dr. Rohatgi prescribed Imipramine and instructed plaintiff to continue with individual and family therapy.  (Tr. 447-49.)

No further treatment appears in the record until May 1996 when plaintiff's father telephoned CCC requesting services because of plaintiff's self-destructive behavior, which included stealing, using drugs, and not attending school.  Plaintiff's father also reported that plaintiff made aggressive threats but did not actually make homicidal threats.  An intake assessment was scheduled.  (Tr. 450.)  On July 2, it was noted that plaintiff was not doing well in school, was using drugs, and had an attitude problem.  It was determined that it was not a crisis situation, and information was given regarding drug treatment.  (Tr. 452.)  On July 31,

plaintiff failed to appear for a scheduled appointment at CCC. (Tr. 453.)

During another telephone call to CCC in September 1996, it was reported that plaintiff had problems at school, felt stressed out, and could not function. It was noted that plaintiff was in the eleventh grade, could not do ninth grade work, and could not keep his mind on what he was doing. It was noted that plaintiff claimed that he was molested by his step siblings when he was younger. Plaintiff's father reported that plaintiff was depressed, tearful, and immature for his age. Plaintiff was non-violent. An appointment was made. (Tr. 454.)

Plaintiff thereafter visited CCC on September 11 and reported having trouble concentrating at school and that he did not want to be held back again. Plaintiff reported having trouble sitting still, that his mind wanders, and that his thoughts are always "zipping." Plaintiff reported a history of drug abuse as well as being a victim of sexual abuse. Mental status examination showed plaintiff to be talkative and bright. Plaintiff reported having no suicidal ideation. Licensed professional counselor John D. Cooley noted plaintiff to have remarkable insight and judgment. Plaintiff was cooperative and friendly. LPC Cooley noted plaintiff to have a full affect and mood. Plaintiff's thought content was organized. LPC Cooley noted plaintiff to be alert and knowledgeable. LPC Cooley diagnosed

plaintiff with generalized anxiety disorder and assigned a GAF score of 75.[3]  It was

determined that options other than public school would be explored for plaintiff.

(Tr. 455-57.)

Plaintiff's father called CCC on September 18, expressing concern that

plaintiff was worse than his counselor realized.  Plaintiff was not making suicidal

threats.  A psychiatric referral was considered.  (Tr. 458.)

Plaintiff visited with LPC Cooley on September 24 and October 31, 1996,

who noted plaintiff to appear angry, depressed, and resentful and to have a "tough

guy" image about him.  Between October 1 and November 25, 1996, plaintiff

failed to appear for three scheduled appointments with LPC Cooley.  (Tr. 459-60.)

The record shows that plaintiff was evaluated at CCC in August 1997 upon

being incarcerated for Statutory Rape.  Plaintiff was seventeen years of age.  LPC

Gary Underwood administered the Millon Multiaxial Clinical Inventory III and the

Minnesota Multiphasic Personality Inventory II, which indicated that plaintiff

continued to suffer from some depression and anxiety that seemed chronic in

nature and dated back to early childhood.  LPC Underwood identified instances

evidencing a pattern of self-defeating behavior.  (Tr. 461-63.)  LPC Underwood

opined that the "presence of a lot of structure is needed for an extended period of

---

[3]  A GAF score between 71 and 80 indicates symptoms that are transient and expectable reactions to psychosocial stressors (*e.g.,* difficulty concentrating after family argument) with no more than a slight impairment in social, occupational or school functioning (*e.g.,* temporarily failing behind in schoolwork).

time if there is any hope of making a change in this young man." (Tr. 463.) LPC Underwood recommended that plaintiff be placed in a youth-based program, undergo psychiatric evaluation for medication, and receive outpatient counseling to assist in dealing with anger and resentment toward life. LPC Underwood opined that incarceration in the Department of Corrections could worsen plaintiff's condition. (Tr. 463.)

The administrative record contains treatment records from the Missouri Department of Corrections (MDOC) from October 2001 to April 2010. (*See* Tr. 467-701.) A review of these records shows plaintiff to have received mental health treatment throughout his incarceration at the MDOC with such treatment including counseling sessions, individual and group therapy, and medication management.

From October 2001 to September 2004, plaintiff received treatment in the form of counseling only. Mental status examinations during this period were largely unremarkable, with plaintiff exhibiting essentially normal behavior. To the extent plaintiff experienced isolated exacerbations of anxiousness, paranoia, or increased stress, they were observed to be situational in nature and related to correctional staff conduct, family issues, and the anticipation of being released from prison.

In September 2004, plaintiff underwent a psychiatric evaluation from which he was diagnosed with mood disorder, not otherwise specified. It was noted that

plaintiff also reported symptoms of ADHD, mixed personality disorder, and a history of oppositional defiant disorder and conduct disorder but currently displayed no symptoms thereof. Bipolar disorder was to be ruled out. Tegretol was prescribed and plaintiff responded well to the medication. In January 2005, plaintiff's medication was increased. Risperidone was added to plaintiff's medication regimen in February for mood stabilization given his irritability, paranoia, and inability to feel pleasure. In March and April, plaintiff was exhibiting no symptoms of a mental disorder and he requested to be weaned from medication.

Beginning in May 2005, plaintiff stopped taking his medications but continued with counseling. Mental status examinations were essentially unremarkable and, in July, it was determined that his mood disorder was in remission. A GAF score of 70 was assigned. Throughout 2006, plaintiff continued with counseling but was prescribed no medication. He occasionally failed to appear for counseling sessions. Plaintiff's mental status examinations continued to be essentially normal, but plaintiff was repeatedly observed by his counselors to be manipulative. Plaintiff received GAF scores demonstrating mild symptoms and it was noted throughout that plaintiff had no mental health issues and was doing fine. Likewise, in 2007, plaintiff continued to do well with counseling. Increased episodes of stress were again noted to be situational in

nature.  Mental status examinations continued to be unremarkable and GAF scores continued to range between 65 and 70, indicating mild symptoms.

In March 2008, plaintiff began to complain of mood swings, depression, and paranoia.  Plaintiff was observed to be irritable and angry, but counselors continued to observe plaintiff to be manipulative with his treatment.  Plaintiff was seen by a psychiatrist in June, who diagnosed plaintiff with mood disorder and anxiety disorder, not otherwise specified.  Zoloft and Hydroxyzine were prescribed, and continued counseling was ordered.  Throughout the remainder of 2008, plaintiff was observed to be stable on this medication with his counselors noting no symptoms.  Plaintiff's medication dosage was increased in January 2009 upon his complaints of increased anxiety, fear, and paranoia involving his anticipated release.  Thereafter, and through April, plaintiff was determined to be stable upon this increased dosage.  Beginning in May 2009, plaintiff refused his medications.

In August 2009, plaintiff attempted suicide with a noose made from a bed sheet.  It was noted that plaintiff was distraught by being discharged from the Missouri Sexual Offenders Program and was fearful of being institutionalized. Plaintiff was considered stable upon his release from suicide watch and, in September, was determined to be doing okay while on medication.  Beginning in October, plaintiff refused his medications as well as a psychiatric referral.  Plaintiff

failed to appear for counseling sessions in December 2009 and again in January 2010. Plaintiff refused treatment in February 2010 but reported having no complaints. Mental status examination in March was normal. Plaintiff was released from prison in April 2010 whereupon he filed for disability benefits.

On July 19, 2010, Stephen S. Scher, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's anxiety and history of mood disorder caused mild limitations in activities of daily living; moderate limitations in social functioning and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (Tr. 711-21.) In a Mental RFC Assessment completed that same date, Dr. Scher opined that in the domain of Understanding and Memory, plaintiff was moderately limited in his ability to understand and remember detailed instructions but was not otherwise significantly limited. In the domain of Sustained Concentration and Persistence, Dr. Scher opined that plaintiff was moderately limited in his ability to carry out detailed instructions but was not otherwise significantly limited. In the domain of Social Interaction, Dr. Scher opined that plaintiff was moderately limited in his ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors, but was not otherwise significantly limited. In the domain of Adaptation, Dr. Scher opined that plaintiff was not significantly limited

in any regard.  (Tr. 722-25.)

Plaintiff did not seek or receive mental health treatment until July 4, 2011, when he went to the emergency room at Southeast Missouri Hospital (SE Hospital) requesting an evaluation for increased stress and suicidal and homicidal ideations. Plaintiff was thirty years of age.  Plaintiff reported having previously received medications while in prison, but that he was released without medication and could no longer suppress his feelings.  Psychiatric examination showed plaintiff to have an anxious affect.  Plaintiff was oriented times three and had normal concentration and memory.  Plaintiff's insight and judgment were noted to be poor.  Plaintiff had some thought of hurting himself or others but had no plan.  Plaintiff expressed thoughts that his family may hurt him.  Historical diagnoses of bipolar disorder and PTSD were noted.  Plaintiff was diagnosed with depression.  (Tr. 863-64.) Plaintiff was admitted to the hospital and given Buspar, Celexa, Klonopin, and Sinequan.  (Tr. 859.)

Upon admission to the hospital, plaintiff was evaluated by Dr. John Lake and reported that he was struggling with adjusting to life outside of prison and that he was chronically fearful and anxious.  Plaintiff reported having recently had bad thoughts and felt guilty and depressed for having intense sexual fantasies and lustful thoughts inasmuch as he was taught in prison that such thoughts were unacceptable.  Plaintiff reported not wanting to act on these thoughts but instead

wanted to gain control of them. Plaintiff denied any recent use of alcohol or illicit drugs. Mental status examination showed plaintiff to be visibly anxious and depressed. Plaintiff's affect was mildly labile. Plaintiff was cooperative and friendly, and his flow of thought was logical and goal directed. Plaintiff had mild paranoid ideations and fearfulness of others. His insight and judgment were noted to be impaired. Dr. Lake diagnosed plaintiff with PTSD. Mood disorder was to be ruled out. Dr. Lake assigned a GAF score of 40.[4] (Tr. 856-58.) Upon receiving therapeutic treatment, plaintiff was discharged on July 8. (Tr. 854-55.)

On August 2, 2011, plaintiff visited Daniela Kantcheva, APRN, BC, MHNP, for psychotherapy as a follow up from his admission at SE Hospital. Plaintiff reported having difficulty adjusting to life outside of prison and was having flashbacks and nightmares. Plaintiff reported feeling anxious, helpless, and hopeless. Mental status examination was unremarkable in that plaintiff's mood and affect were appropriate; his thought process was logical; he was oriented times four; he had fair insight and judgment; and he denied any suicidal or homicidal ideations. Ms. Kantcheva diagnosed plaintiff with PTSD. Bipolar disorder was to be ruled out. Plaintiff was instructed to continue with Doxepin, Celexa, and Buspar. Plaintiff was given samples of Saphris and was instructed to follow up in

[4] A GAF score between 31 and 40 indicates some impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work).

two weeks. It was noted that plaintiff was scheduled to follow up with Dr. Knot in September for psychiatric evaluation and medication management. (Tr. 823.)

Plaintiff was admitted to the emergency room at SE Hospital on August 14, 2011, with suicidal ideation. Plaintiff was noted to have superficial lacerations to both wrists, and he reported that he cut himself with his pocketknife while walking to the hospital after fighting with his girlfriend. Plaintiff was placed on suicide precaution. Plaintiff denied any alcohol or drug abuse. Psychiatric evaluation showed plaintiff to have an agitated affect. Plaintiff was oriented times three and had normal insight, concentration, and memory. Plaintiff's judgment was noted to be poor. Plaintiff stabilized while in the emergency room and was admitted to the psychiatric unit at the hospital. (Tr. 845-47.)

Upon his admission to the psychiatric unit, plaintiff was evaluated by Dr. Lake and reported that he was not suicidal but instead was taking out his frustration and anger on himself. It was noted that plaintiff's girlfriend kicked him out and told him to leave. Plaintiff's only complaint was noted to be anxiety. Plaintiff reported being compliant with his medication and with his counseling sessions at CCC. Dr. Lake diagnosed plaintiff with PTSD and assigned a GAF score of 45 upon admission.[5] Dr. Lake determined plaintiff's cutting to be more of

---

[5] A GAF score between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

an act of self-mutilation and not an indicator of suicide risk. Dr. Lake determined plaintiff to be stable for outpatient management. Plaintiff's Klonopin was discontinued. Plaintiff was started on Ativan for better control of anxiety. Plaintiff was continued on his other medications and was instructed to follow up at CCC as scheduled. Plaintiff was assigned a GAF score of 55 upon his discharge on August 15.[6] (Tr. 840-43.)

Plaintiff returned to the emergency room at SE Hospital on August 17 with complaints of suicidal ideation, depression, and anxiety. Plaintiff reported his Ativan to have been ruined the day before and that he had become very anxious with worsening depression. Plaintiff reported that he walked to a bridge with the intent to jump in the river but decided to cut his wrist and forearm while sitting on the bridge. The police brought him to the emergency room. Plaintiff reported no longer being suicidal and that he wanted to go home. Blood tests showed the presence of cannabinoids. Plaintiff denied alcohol or drug abuse. Dr. Lake determined plaintiff to be low risk and did not feel that plaintiff would benefit from a repeat admission. Dr. Lake did not refill plaintiff's Ativan. (Tr. 781, 836-38.)

On February 28, 2012, plaintiff underwent a consultative psychological evaluation and reported to Ben Lanpher, Ph.D., that he experienced a lot of anxiety

---

[6] A GAF score between 51 and 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

which made it difficult for him to go places.  Plaintiff reported feeling that people

were following him and out to get him.  Plaintiff reported not feeling safe in public

and that he was suicidal.  Dr. Lanpher noted plaintiff to be taking no medications

in that he had run out of prescribed medication in January.  Plaintiff reported

having been psychiatrically hospitalized twice in July 2011 but was not admitted in

August 2011 because of a lack of insurance.  Plaintiff reported having nightmares

and flashbacks regarding his previous sexual abuse and that he also had insomnia.

Plaintiff reported symptoms characteristic of bipolar disorder.  Plaintiff reported

that he was recently married and that his marriage was happy and hopeful.

Plaintiff reported not living with his wife, however, and that her ex-husband was

seeking custody of the children given plaintiff's status as a registered sex offender.

Plaintiff denied any drug use since being released from prison.  Mental status

examination showed plaintiff to have a depressed and anxious mood with a labile

affect.  Plaintiff's speech was somewhat monotone and his motor behavior was

lethargic.  Plaintiff reported no current suicidal ideation but admitted to having

such thoughts as recent as three weeks prior.  Plaintiff had no homicidal thoughts.

Plaintiff demonstrated good abstract thinking.  He scored 28 out of 30 on the mini-

mental status exam.  Scores obtained on the Shipley test were perceived to fairly

depict plaintiff's level of intellectual ability, which was determined to be in the

low-average range.  Results of the MMPI-2RF were perceived as having

questionable validity.  Dr. Lanpher concluded that plaintiff exhibited symptoms characteristic of a mood disorder, with recurrent episodes of depression and possibly episodes of mania.  A diagnosis of bipolar disorder could not be confirmed.  Dr. Lanpher opined that plaintiff appeared to possess traits of antisocial personality.  Dr. Lanpher diagnosed plaintiff with mood disorder, not otherwise specified; and generalized anxiety disorder.  Dr. Lanpher determined plaintiff's current GAF score to be 44, with his highest score in the previous year to be 53.  Dr. Lanpher recommended that plaintiff undergo a psychiatric evaluation for further assessment and treatment, including the assessment of potential benefits of psychotropic medications.  Dr. Lanpher further recommended that plaintiff participate in individual counseling.  (Tr. 865-69.)

## IV.  Supplemental Evidence / Post-September 7, 2012

Subsequent to entering his decision on September 7, 2012, the ALJ received additional evidence into the record.  The ALJ reopened the case to take such evidence, after which he issued another decision on September 27, 2012.  Such additional evidence is as follows:

A.    Medical Records

On May 17, 2012, plaintiff visited clinical therapist Crendy Tarkington at Bootheel Counseling Services (BCS) and Family Medical Clinic requesting counseling and medication management.  Plaintiff denied suicidal or homicidal

ideation.  Plaintiff reported having episodes of depression and episodes of abundant energy and anxiety.  Plaintiff reported that he received a two-weeks' supply of medication from the emergency room at SE Hospital about three or four weeks prior and was now out of medication.  Plaintiff reported his sleep and stress to make him "not as sharp minded."  Plaintiff reported being unemployed for two years and that he wanted to work.  Plaintiff currently performed odd jobs such as mowing grass, power washing, and having yard sales.  Mental status examination showed plaintiff's mood, behavior, speech, motor activity, and thought content to be appropriate.  Plaintiff was noted to be paranoid and restricted.  Plaintiff was oriented times three and had intact memory, fair insight and judgment, and good eye contact.  He was determined not to be a current danger to himself or others.  Ms. Tarkington diagnosed plaintiff with mood disorder, not otherwise specified, severe and assigned a GAF score of 60.  An appointment with the medical clinic was scheduled for June.  Plaintiff reported that he would contact Medicaid in order to schedule an earlier appointment with a physician for medication.  Follow up with individual counseling was planned.  (Tr. 884-89.)

Plaintiff visited BCS's medical clinic on June 6, 2012, to establish medication management.  Plaintiff reported his depression and anxiety to be at a level ten on a scale of one to ten.  Plaintiff reported having nightmares and delusional and paranoid thoughts that people were out to get him.  Plaintiff denied

any substance abuse but reported that blood tests may yield positive results, which led the evaluating clinician, Rosemary L. Collins, MHNP, BC, APRN, to question plaintiff's truthfulness.[7]  Plaintiff reported that he last smoked marijuana a couple of months prior.  NP Collins noted plaintiff to have been prescribed Buspar, Hydroxyzine, and Citalopram by an emergency room doctor on May 2, 2012, but otherwise had not been prescribed medication since December 2011.  Plaintiff reported that he responded well to Ativan in the past, and NP Collins noted Dr. Lake to have likewise reported positive response.  Mental status examination showed plaintiff to be disheveled and agitated with fairly agitated psychomotor activity.  NP Collins noted plaintiff to be somewhat deceptive with his statements.  Plaintiff's mood and affect were irritable to depressed and anxious.  Plaintiff's thought process was goal directed and focused on obtaining medication.  Plaintiff was alert and oriented but was deceptive with memory recall.  Concentration was noted to be poor.  Plaintiff reported being paranoid.  Intellectual functioning was estimated to be low average to borderline, and insight and judgment appeared to be limited.  Plaintiff had no suicidal or homicidal ideations.  Plaintiff was given a two-week supply of Ativan but it was determined that he would not be allowed to continue on Ativan given that his substance abuse may be more than as he

---

[7] While NP Collins was the evaluating clinician, staff psychiatrist Dr. Syed Sayeed also signed the evaluation report.

reported.  Celexa, Doxepin, and Buspar were also prescribed.  It was determined that plaintiff would need further evaluation before being diagnosed with PTSD.  Marijuana abuse and substance induced mood disorder were to be ruled out.  Plaintiff was diagnosed with mood disorder, not otherwise specified.  A GAF score of 50 was assigned.  Plaintiff was instructed to continue with individual therapy and to return in four weeks for follow up.  (Tr. 878-81.)

Plaintiff visited Ms. Tarkington on June 15, 2012, and reported that he felt better with medication and had improved with expressing his anger.  Ms. Tarkington noted plaintiff's mood to be depressed, angry, and irritable.  Plaintiff's thought process was noted to be paranoid.  Plaintiff's behavior, speech, and motor activity were appropriate, and his memory was intact.  Plaintiff's insight and judgment were fair.  Ms. Tarkington determined plaintiff to pose no current danger to himself or others.  Plaintiff was instructed to return in one week.  (Tr. 876.)

Plaintiff returned to NP Collins/Dr. Sayeed on June 20, 2012, and reported doing well but requested that his dosage of Ativan be increased.  It was noted that plaintiff had a positive drug screen.  Plaintiff reported that he had been "clean" for two months and then admitted that he self-medicates with THC.[8]  Mental status examination showed plaintiff to have a flat affect and his mood was dysphoric to

---

[8] Tetrahydrocannabinol (THC) is marijuana's main psychoactive ingredient. *DrugFacts:  Is Marijuana Medicine?*, National Institute on Drug Abuse (last revised Apr. 2014), *available at* <http://www.drugabuse.gov/publications/drugfacts/marijuana-medicine>.

defensive.  Plaintiff's thought process was goal directed and his judgment and insight were fair.  Plaintiff had no suicidal or homicidal ideations.  Plaintiff was diagnosed with THC abuse and mood disorder.  Substance induced mood disorder was to be ruled out.  A GAF score of 50 was assigned.  Plaintiff was referred to Dr. Sayeed and was instructed to return in one month.  Plaintiff's medications, including Ativan, were refilled.  (Tr. 873-74.)

Plaintiff returned to NP Collins/Dr. Sayeed on July 17, 2012, and reported an increase in anxiety because of court appearances, his family being "split up" because of his past, and financial issues.  Plaintiff reported his depression to be improving.  Plaintiff had no suicidal or homicidal ideations.  It was noted that plaintiff had a fair response to his medications with no side effects.  Plaintiff denied THC use and alcohol use.  Plaintiff was instructed to continue on his current medication regimen until the results of drug screening were known, and his medications were refilled.  Plaintiff was diagnosed with THC abuse, mood disorder, and substance induced mood disorder.  Plaintiff again had a GAF score of 50.  (Tr. 871-72.)

B.     Interrogatory Posed to Medical Expert

When Dr. O'Brien testified at the administrative hearing on August 27, 2012, she had not had the opportunity to review the medical/counseling records from BCS that documented plaintiff's treatment there from May through July

2012. In an interrogatory dated September 17, 2012, the ALJ asked Dr. O'Brien to comment upon this evidence. (Tr. 891.)

In response to the ALJ's interrogatory, Dr. O'Brien noted plaintiff's admission to abusing marijuana and of the NP's warning that the use of such substance interferes with the effectiveness of his medications. Dr. O'Brien opined that "[i]n the absence of substance abuse and full cooperation with ongoing treatment recommendations," plaintiff would have mild difficulties in activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, and/or pace; with no episodes of decompensation. With the presence of substance abuse, Dr. O'Brien opined that plaintiff had moderate difficulties in activities of daily living; marked difficulties in social functioning and in maintaining concentration, persistence, and/or pace; and would be expected to have future episodes of decompensation given that substance abuse interferes with the effectiveness of medication. (Tr. 893-94.)

## V. The ALJ's Decisions

In his decision entered September 7, 2012, the ALJ summarized the evidence of record that was before him at that time – including education records, medical treatment records, and consulting records – made findings thereon, and determined plaintiff to have the RFC to perform a full range of work at all exertional levels but was restricted to simple, repetitive tasks and instructions

involving only occasional interaction with co-workers, supervisors, and the general public.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that plaintiff could perform work as it exists in significant numbers in the national economy, as testified to by the vocational expert.  (Tr. 28-38.)

In his decision entered September 27, 2012, the ALJ supplemented his previous decision by addressing the additional medical evidence of record as well as Dr. O'Brien's medical expert opinion regarding such additional evidence.  The ALJ concluded that plaintiff's mood disorder with substance induced paranoia and cannabis abuse were severe impairments, but that such impairments, either singly or in combination, did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found plaintiff to have the RFC to perform the full range of work at all exertional levels but was restricted to simple, repetitive and routine work with only occasional interaction with co-workers, supervisors, and the public.  The ALJ found plaintiff to have no past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ found vocational expert testimony to support a finding that plaintiff could perform work as it exists in significant numbers in the national economy, and specifically, manufacturing helper, laundry worker, and machine feeder.  The ALJ thus found plaintiff not to be under a disability since April 23, 2010.  (Tr. 14-19.)

The ALJ's decision of September 27 does not repeat the summary of

evidence recited in the September 7 decision.  Nor does it vacate the September 7 decision as to any findings on the record.  Accordingly, the undersigned will review the ALJ's recitation of evidence in both decisions in determining whether the ALJ's final decision of September 27 is supported by substantial evidence on the record as a whole.

## VI.  Discussion

A claimant is not eligible for SSI benefits for any month throughout which he is a resident of a public institution, such as a prison.  *Cook v. Astrue*, 629 F. Supp. 2d 925, 929 n.3 (W.D. Mo. 2009) (citing 20 C.F.R. § 416.211).  Such a claimant is not considered eligible for receipt of SSI benefits until the first day of the month following the day of his release.  20 C.F.R. § 416.211(a)(1).

To be eligible for SSI under the Social Security Act, plaintiff must prove that he is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not

only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by

substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is

> based upon a proper hypothetical question which sets forth the
> claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir.

1992) (internal citations omitted).  The Court must also consider any evidence

which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at

770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even

though two inconsistent conclusions may be drawn from the evidence, the

Commissioner's findings may still be supported by substantial evidence on the

record as a whole.  *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d

1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a

whole, we must affirm the administrative decision, even if the record could also

have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252

(8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex*

*rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

In this action for judicial review, plaintiff raises numerous claims that the

ALJ erred in the manner and method by which he determined plaintiff not to be

disabled.  The undersigned addresses each claim in turn.

A.    Listings of Mental Disorders

Plaintiff claims that he experiences severe limitations in activities of daily

living and in social functioning, and is markedly limited in his ability to maintain

concentration, persistence, or pace.  Plaintiff also contends that he cannot function

in a work setting with his chronic anger issues that cause him to be homicidal at

times.  In light of these functional restrictions, which plaintiff argues persist even

with medication, plaintiff contends that he meets the relevant criteria of a listed

mental impairment under § 12.00 of the Listings and that the ALJ erred by failing

to so find.  For the following reasons, the ALJ did not err.

Section 12.00 of the Listings of Impairments governs the evaluation of

disability on the basis of mental disorders.  As noted by the Commissioner,

plaintiff does not identify which specific listing under § 12.00 he purports to meet.

Nevertheless, all listed mental impairments under § 12.00 – other than § 12.05 for

mental retardation and the physical effects of § 12.09 substance abuse disorders –

require a claimant to show that his mental impairment meets "paragraph B"

criteria, that is, that it results in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or
   pace; or
4. Repeated episodes of decompensation, each of extended duration.

A marked limitation "means more than moderate but less than extreme."  §

12.00(C).  "A marked limitation may arise when several activities or functions are

impaired, or even when only one is impaired, as long as the degree of limitation is

such as to interfere seriously with your ability to function independently,

appropriately, effectively, and on a sustained basis." *Id.*

In his written decisions here, the ALJ found plaintiff not to have any marked limitations, but instead to have mild restrictions in activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and to have had no episodes of decompensation of an extended duration. (Tr. 15, 31.) Substantial evidence on the record as a whole supports the ALJ's findings that plaintiff's limitations in all domains are less than marked.

With respect to activities of daily living, § 12.00 directs the Commissioner to consider adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office. § 12.00(C)(1). Finding plaintiff to have mild restrictions in this domain, the ALJ specifically noted that plaintiff is capable of most self-care tasks (Tr. 15) and is able to live alone, clean his house, volunteer, prepare meals, perform small household repairs, shop, handle his finances, engage in crafts, and go to church (Tr. 31). Substantial evidence on the record as a whole supports these findings. Although plaintiff contends that his daily activities are restricted by his mistrust of people, chronic fear, and suicide attempts, the record nevertheless shows that, while limited, plaintiff does not experience limitations to such degree as to

interfere seriously with his ability to function independently, appropriately, effectively, and on a sustained basis, as demonstrated by his activities described above and set out in the record. Indeed, the record shows plaintiff not to suffer the claimed limiting effects of his mental impairment when he takes and is compliant with psychotropic medication. *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (impairment cannot be considered disabling if it can be controlled by treatment or medication). The ALJ did not err in finding plaintiff's limitations in his activities of daily living to be less than marked.

With respect to social functioning, § 12.00 directs the Commissioner to consider the claimant's capacity to interact with and get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. The capacity for such interaction may be exhibited by a history of altercations, firings, or social isolation as well as evidence of initiating social contact, participating in group activities, or communicating clearly with others. § 12.00(C)(2). Here, the ALJ found plaintiff to be moderately limited in this domain, specifically noting that plaintiff's occasional paranoia and anger issues affect his ability to get along with others (Tr. 15) but that he nevertheless is able to engage in volunteer work, attend church, go to the mall, shop at stores, and spend time with friends (Tr. 31). The ALJ also noted that plaintiff perceived his inability to get along with people to be the result of others' opinions regarding his criminal history rather than as a

limiting effect caused by his mental impairment. (Tr. 31.) The record also shows that plaintiff's ability to engage in some social activities, such as attending church and performing volunteer work, is limited by his lack of transportation rather than the effects of his mental impairment. Although plaintiff contends that his social functioning is restricted by his mistrust of people, thoughts of hurting others, and sexual fantasies, the record shows these conditions to be abated with medication and treatment. *See Brown*, 390 F.3d at 540. Indeed, at no time since August 2011 did plaintiff exhibit or express any threat to himself or others, and his mental health providers perceived him to be no threat. As such, while the record shows plaintiff to experience limitations in social functioning, the ALJ did not err in finding them not to rise to the level of marked limitations. Although not all the evidence "pointed in that direction," there nevertheless was a sufficient amount that did. *See Moad v. Massanari*, 260 F.3d 887, 891 (8th Cir. 2001).

With respect to concentration, persistence, or pace, the Commissioner must consider the claimant's ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. § 12.00(C)(3). In this domain, the ALJ determined plaintiff to have moderate difficulties, specifically noting plaintiff's anger and anxiety to affect his ability to concentrate and persist with tasks (Tr. 15) but that he nevertheless engages in activities suggestive of good functioning in this

area, such as volunteering, performing basic household repairs, shopping and comparing prices, handling his own finances, following instructions, and meeting his registration requirements with no reported difficulties (Tr. 31). Substantial evidence on the record as a whole supports these findings. Although plaintiff contends that he is restricted in this domain by his racing thoughts, anxiety, and low range of intellectual functioning, the record nevertheless shows that, even during periods of exacerbation, plaintiff demonstrated normal concentration and memory and was goal directed in his thoughts. Although plaintiff's concentration was noted to be poor in June 2012 during examination at the clinic, NP Collins also noted that plaintiff appeared to be deceptive during this exam. There are no other instances of limited concentration or memory in the record. The ALJ did not err in finding plaintiff's limitations in concentration, persistence, or pace to be less than marked.

To the extent plaintiff claims that he experiences episodes of decompensation, the record shows that any exacerbation of plaintiff's symptoms did not meet the durational requirement of the Listings, *see* § 12.00(C)(4); and, further, that such exacerbations occurred during periods when plaintiff was not taking and/or was not compliant with psychotropic medications. *Brown,* 390 F.3d at 540.

Finally, plaintiff contends that he continues to experience functional

limitations despite his medication regimen and that his medication causes adverse side effects, which must be considered under § 12.00(G). However, as noted by the ALJ, plaintiff's limited treatment subsequent to his release from prison shows that medication appeared to stabilize plaintiff's symptoms when he was compliant; and, further, even without consistent medication management, plaintiff exhibited many normal behaviors during mental status examinations, including examinations by Dr. Lanpher and Ms. Tarkington. To the extent plaintiff exhibited remarkable signs and symptoms during other examinations, the record shows such exacerbations to have occurred in relation to situational stressors and to have abated with medication. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (ALJ did not err in finding claimant's depression not to be severe inasmuch as it was situational in nature, related to marital issues, and improved with medication and counseling).

With respect to plaintiff's claim that he experiences sleepiness and grogginess as a side effect of Doxepin, the undersigned notes that plaintiff never complained to any provider that he experienced side effects from any medication and, indeed, reported the contrary in July 2012. As such, to the extent plaintiff claims that consideration of his continued functional limitations and medication side effects pursuant to § 12.00(G) supports a finding that his mental impairment meets a listed impairment under § 12.00, the claim fails.

B.     Consideration of Learning Disorder and GAF Scores

Plaintiff claims that the ALJ failed to properly consider his learning disorder and low GAF scores in determining his mental impairment not to be disabling. For the following reasons, plaintiff's argument is misplaced.

As an initial matter, the undersigned notes that the ALJ specifically addressed plaintiff's educational history and related opinions by educators that he had a learning disorder. The ALJ also noted Dr. Rohatgi's diagnosis in 1994 that plaintiff had a developmental disorder affecting arithmetic, reading, and language. (Tr. 34.) The mere existence of an impairment, however, is not disabling *per se*; there must be a functional loss establishing an inability to engage in substantial gainful activity before disability occurs. *Trenary v. Bowen,* 898 F.2d 1361, 1364 (8th Cir. 1990). Remote evidence of the existence of an impairment is insufficient alone to establish that a claimant currently experiences functional limitations that diminish his capacity to perform work-related activities. *See Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th Cir. 1993).

A review of the record *in toto* shows that during the period relevant to disability, treating and consulting providers opined that plaintiff possessed low average to borderline intellectual functioning.[9] While the ALJ did not specifically

---

[9] While the ALJ discussed the evidence obtained from these providers, he did not specifically address their findings as to plaintiff's intellectual functioning. This failure to cite to these specific findings does not mean that the ALJ did not consider them. *Montgomery v. Chater,* 69

find plaintiff's level of intellectual functioning to be an impairment, he included in the RFC determination a finding that plaintiff was limited to the performance of simple, repetitive, and routine work. Such a limitation adequately accounts for plaintiff's level of intellectual functioning. *See Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001).

To the extent plaintiff argues that the ALJ failed to evaluate plaintiff's GAF scores, a review of the ALJ's decisions belies this contention. (*See* Tr. 16-17, 35-36.) Nevertheless, as noted by the Commissioner, the GAF scale has not been endorsed for "use in the Social Security and SSI disability programs" and "does not have a direct correlation to the severity requirements in [the] mental disorders listings." 65 FR 50746-01, 50764, 2000 WL 1173632 (Soc. Sec. Admin. Aug. 21, 2000); *see also Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010). As such, an ALJ is not bound by GAF scores assigned by a claimant's provider in determining the effects of the claimant's mental impairment; instead, the ALJ must review the record as a whole. *Halverson*, 600 F.3d at 931. This is what the ALJ did here.

C.    Consideration of Drug Use in Credibility Determination

In his written decisions, the ALJ found plaintiff's subjective complaints not

---

F.3d 273, 275 (8th Cir. 1995) (ALJ's failure to cite specific evidence does not indicate that such evidence was not considered).

to be entirely credible due, in part, to his statements in the record denying any substance abuse when objective testing showed otherwise. (Tr. 16, 33.) Plaintiff claims that the ALJ's accusation that he used drugs was an improper basis upon which to discredit his subjective complaints inasmuch as "[t]here is no indication in this file the Plaintiff ever tested positive for drugs." (Pltf.'s Brief, Doc. #14 at p. 18.) Because the record clearly shows that blood tests yielded positive results for the presence of cannabinoids (Tr. 781, 873-74), plaintiff's claim that "[t]here is no proof whatsoever that [he] is using drugs" is without merit.

D.     Closed Period of Disability

Plaintiff claims that the ALJ legally erred by failing to consider whether he was entitled to a closed period of disability, arguing the record to show that he has not yet mentally adjusted to life outside of prison but may at some point in the future be able to perform substantial gainful activity.

As noted by the Eighth Circuit, disability is not an "all-or-nothing" proposition. A claimant may be eligible to receive benefits for a specific period of time. *Harris v. Secretary of Dep't of Health & Human Servs.*, 959 F.2d 723, 724 (8th Cir. 1992); *Atkinson v. Bowen*, 864 F.2d 67, 71 (8th Cir. 1988). "However, even within a closed period, a claimant must still meet the definition of disability[.]" *Devary v. Colvin*, ___ F. Supp. 2d ___, No. C13-3035-LTS, 2014 WL 1089164, at *6 (N.D. Iowa Mar. 19, 2014). Because the ALJ properly

determined plaintiff not to be disabled at any time during the relevant period, he

did not err in failing to consider a closed period of disability. *See Clark v. Bowen*,

864 F.2d 66 (8th Cir. 1988) (per curiam).

Throughout his incarceration, plaintiff received mental health treatment

through counseling and/or medication management. The record shows that

plaintiff did not exhibit abnormal behaviors during such treatment and that any

exacerbations of symptoms were situational in nature and ameliorated with an

adjustment to treatment. Beginning in October 2009, plaintiff refused medication

and counseling. Notably, however, plaintiff reported no complaints after October

2009, and mental status examination in March 2010 yielded normal results.

Plaintiff was released from prison in April 2010 and, as noted by the ALJ, sought

no treatment until July 2011. Plaintiff began receiving treatment through

counseling and medication in July and August 2011, with exacerbations of

symptoms noted to be related to relationship stressors. Even during these periods

of exacerbation, Dr. Lake determined plaintiff to be "low risk" and stable for

outpatient treatment instead of requiring hospitalization. Thereafter, plaintiff

received no treatment or evaluation until February 2012 at which time plaintiff

exhibited symptoms consistent with mood disorder and anxiety disorder; but, as

noted by Dr. Lanpher, plaintiff had not taken medication for his condition since

January, when the medication ran out. Plaintiff's condition was noted to improve

with a resumption of counseling and medication management beginning in May 2012.

As demonstrated above, the record shows plaintiff not to have met the definition of disability at any time during the relevant period and thus not eligible for consideration of a closed period of disability. Upon plaintiff's release from prison, he exhibited no symptoms and reported no complaints rising to the level of a disabling mental impairment. From April 2010 to July 2011, there exists no medical evidence upon which the ALJ could find plaintiff's mental impairment severe enough to affect his ability to work. 20 C.F.R. § 416.908 (disabling impairment must be established by medical evidence). *Cf. Benskin v. Bowen,* 830 F.2d 878, 884 (8th Cir. 1987) (claimant's failure to seek medical treatment inconsistent with complaints of disabling impairment). Even if plaintiff was given the benefit of the doubt and found to be unable to engage in substantial gainful activity as of July 2011, plaintiff nevertheless could not meet the twelve-month durational requirement for disability inasmuch as treatment beginning in May 2012 improved plaintiff's condition, including objective improvement in overall mental status. *See Brown,* 390 F.3d at 540 (impairment controlled by medication not disabling); *Van Winters v. Colvin,* No. 1:12-CV-71-SPM, 2013 WL 4402971, at *8 (E.D. Mo. Aug. 14, 2013) (disabling condition must last for twelve months during closed period). *See also Bauerly v. Colvin*, No. C13-4048-MWB, 2014 WL

980807, at *6 (N.D. Iowa Mar. 11, 2014).

Accordingly, because plaintiff did not meet the definition of disability at any time during the relevant period, the ALJ did not err in failing to consider whether plaintiff was eligible for a closed period of disability.

E.     RFC Limitation in Social Contact

Plaintiff claims that the ALJ's RFC determination failed to account for his inability to work in close proximity to co-workers and supervisors given his paranoia, antisocial personality disorder, and poor judgment and insight. Plaintiff's claim is without merit.

In his RFC determination, the ALJ restricted plaintiff to only occasional interaction with supervisors, co-workers, and the general public.[10]  The vocational expert testified that a person with such a limitation could perform the jobs of manufacturing helper, laundry worker, and machine feeder.  As defined in the *Dictionary of Occupational Titles* (DOT), these jobs do not require significant contact with other people and are rated at a Level 8 for amount of interaction.  *See* DOT #809.687-014 (manufacturing helper); DOT #361.685-018 (laundry worker) DOT #699.686-010 (machine feeder).  Level 8 interaction requires:  "Taking Instructions–Helping:  Attending to the work assignment instructions or orders of

---

[10] To engage in an activity "occasionally" means less than frequent in that the activity or condition exists up to one-third of the time. *See Owens v. Colvin*, 727 F.3d 850, 851-82 (8th Cir. 2013) (as defined by the DOT, used by the Regulations as a resource for determining duties of work).

supervisor.  (No immediate response required unless clarification of instructions or orders is needed.)  Helping applies to 'non-learning' helpers."  DOT, Appendix B, 1991 WL 688701.  Level 8 interaction is compatible with an RFC limiting a claimant to only superficial contact with co-workers, supervisors, and the public. *See, e.g., Flaherty v. Halter*, 182 F. Supp. 2d 824, 850-51 (D. Minn. 2001); *Goforth v. Colvin*, No. 13-cv-274-TLW, 2014 WL 1364992, at **5-6 (N.D. Okla. Apr. 6, 2014) (DOT Level 8 interaction is consistent with superficial contact with supervisors and co-workers, and no contact with general public).  *See also Arsenault v. Astrue*, No. 08-269-P-H, 2009 WL 982225, at *3 (D. Me. 2009) (citing cases) (level of interaction denoted as "not significant" in DOT compatible with limitation to no significant or no more than occasional interaction with public, co-workers, and supervisors).  It cannot be said therefore, that the ALJ's RFC limitation restricting plaintiff to only occasional contact with supervisors and co-workers in jobs involving Level 8 interaction as defined by the DOT would require plaintiff to work "in close proximity" to such persons.

Plaintiff's claim that the ALJ's RFC determination failed to account for his limited social contact therefore fails.

F.    Vocational Expert Testimony

Finally, plaintiff argues that the ALJ erred by failing to elicit testimony from the vocational expert at the second hearing.  Plaintiff contends that it was error for

the ALJ to rely on vocational expert testimony that was elicited at the first hearing, when plaintiff was not represented by counsel.

As an initial matter, the undersigned notes that a vocational expert was present at the second hearing when counsel was likewise present for plaintiff. The ALJ announced on the record that he intended not to obtain testimony from the vocational expert, indicating that the vocational expert's testimony from the previous hearing continued to be applicable. Counsel did not object to the ALJ's decision to not question the vocational expert. Nor did counsel request permission to question the vocational expert, despite the ALJ's query to counsel as to whether he wished to proceed further. In these circumstances, it cannot be said that plaintiff was deprived of the opportunity to develop the record as to vocational expert testimony. *Cf. Richardson v. Perales*, 402 U.S. at 409-10.

Notably, in his claim here, plaintiff does not identify or elaborate upon any limitations he claims should have been posed to the vocational expert at the second hearing that were not included in the hypothetical question posed at the first hearing. *Cf. Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008) (claimant did not identify what limitations were missing from the hypothetical). With nothing more, plaintiff's blanket claim that the ALJ should not have relied on vocational expert testimony obtained without counsel for plaintiff does not provide a basis for relief in the circumstances of this case.

To the extent plaintiff argues that the ALJ also improperly relied on the opinion of the medical expert regarding the effects of plaintiff's drug use given that "[t]here is absolutely no proof that Plaintiff is using drugs" (Pltf.'s Brief, Doc. #14 at p. 20), this claim fails for the reasons discussed *supra* at Section VI.C.

## VII.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled from April 23, 2010, is supported by substantial evidence on the record as a whole, and plaintiff's claims of error are denied.

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 16th day of October, 2014.


＿＿/s/ Nannette A. Baker＿＿＿＿＿＿＿
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE